UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖

**PHILLIP OZDEMIR, ADMINISTRATOR AD
PROSEQUENDUM OF THE ESTATE OF BABY DOE, AN
UNBORN BABY BETWEEN PHILLIP OZDEMIR AND
MARY CATHERINE BARRY, AND PHILLIP OZDEMIR,
AS AN INDIVIDUAL,**

                                **Plaintiff,**

                **-v-**                                **3:02-CV-1600**

**SOMERSET MEDICAL CENTER, SOMERSET HEALTH
CARE CORPORATION, BOARD OF DIRECTORS OF
SOMERSET HEALTH CARE CORPORATION, AND
JOHN AND JANE DOES 1-100**

                                **Defendants.**

❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖❖

APPEARANCES:

Phillip OZDEMIR, Plaintiff, *Pro Se*

SMITH, SOVIK LAW FIRM
James D. Lantier, Esq., of Counsel
Gabrielle Mardany Hope, Esq., of Counsel
250 South Clinton Street, Suite 600
Syracuse, New York 13202-1252
Counsel for Defendants

**Norman A. Mordue, Chief U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

        Presently before the Court are two motions: defendant's motion (Dkt. No. 68) for

summary judgment dismissing the action, and plaintiff's cross motion (Dkt. No. 69) for leave to

file and serve a second amended complaint.[1]   For the reasons set forth below, defendant's motion

for summary judgment is granted and plaintiff's cross motion is denied.

## BACKGROUND

In his amended complaint (Dkt. No. 23), plaintiff claims that decedent Mary Catherine

Barry ("Barry") died at the age of 46 as a result of negligent medical care occurring while she was

a patient at defendant Somerset Medical Center from November 1, 2000 until her death on

January 4, 2001.  Plaintiff asserts a bystander claim for negligent infliction of emotional distress

under New Jersey law based his claim that he and Barry, although unmarried, shared an intimate

familial relationship, *see Dunphy v. Gregor*, 642 A.2d 372, 377, 380 (N.J.Sup.Ct. 1994), and that

he witnessed the negligent medical care, observed its effect on Barry, and immediately connected

the negligent care with Barry's injury and ultimate death.  *See generally Gendek v. Poblete*, 654

A.2d 970, 974-75 (N.J.Sup.Ct. 1995); *Frame v. Kothari*, 560 A.2d 675, 681 (N.J.Sup.Ct. 1989).

Plaintiff sought court-ordered disclosure of Barry's medical records.  By Memorandum-

Decision and Order (Dkt. No. 55) dated May 31, 2006, this Court addressed plaintiff's request in

light of the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d-1, *et*

*seq.* ("HIPAA").  The Court noted that protection of the privacy of patients' medical information

is a primary objective of HIPAA, *see Citizens for Health v. Leavitt*, 428 F.3d 167, 171 (3d Cir.

2005), and that HIPAA's privacy protections extend to the health information of a deceased

---

[1]

Phillip Ozdemir, individually, is the sole remaining plaintiff in the case and is referred to herein
as "plaintiff."  In the amended complaint (Dkt. No. 23), plaintiff abandoned all claims on behalf
of Barry while continuing to assert claims as "administrator ad prosequendum of the estate of
Baby Doe."  On August 12, 2005, the Court dismissed without prejudice any and all claims on
behalf of the estates of Mary Catherine Barry and Baby Doe (Dkt. No. 39).

person.  The Court stated:

> [I]n view of the fact-specific nature of a *Dunphy*-type claim, HIPAA's goal of
> protecting the privacy of patients' medical information, and the potential for
> unwarranted invasions of privacy, the Court holds that, to obtain court-ordered
> access to decedent's protected medical records, plaintiff must first make a *prima
> facie* showing that he and decedent shared an intimate, familial relationship within
> the meaning of *Dunphy*.  Plaintiff's own averments should be supported by other
> evidence.  Thus, if plaintiff wishes to pursue this discovery request, he must do so
> by a new motion.  If an executor, administrator, or other person has been
> authorized to act on behalf of decedent or decedent's estate, any new motion must
> be served on that person.

Thereafter, plaintiff moved (Dkt. No. 60) to compel defendant to produce the names and

addresses of all medical testing laboratories that performed blood, urine, and sputum infection

analysis for defendant Somerset Medical Center during the time that Barry was hospitalized there,

as well as the certificate of incorporation, organizational charts, and other information concerning

Somerset Medical Center.  In his order (Dkt. No 67) addressing the motion, United States

Magistrate Judge David E. Peebles stated:

> During the course of oral argument in connection with plaintiff's motion it became
> clear that the issue of his standing to bring claims based on the death of Mary
> Catherine Barry, whose estate he has not been authorized to represent, is of
> paramount concern in the case.  If the plaintiff is able to establish to Chief Judge
> Mordue's satisfaction that he has the requisite standing, or at a minimum an issue
> of fact exists as to whether or not he can satisfy the requirements of either New
> York or New Jersey law, whichever is deemed applicable, on the issue, plaintiff
> may convince the court that he is entitled to discovery of documents and
> information relevant to his claims and defenses, including, inter alia, the medical
> records to which he was previously denied access by Chief District Judge Mordue,
> without prejudice to his right to reapply for an order permitting disclosure of those
> documents.
>
> In reviewing the matter, I am satisfied that in the event discovery is allowed to go
> forward addressing all of the claims and defenses currently interposed in the
> action, a great deal of time and effort will be expended by the parties, and
> discovery is likely to be a lengthy and contentious process, requiring considerable

court oversight. Such efforts would be rendered unnecessary, however, in the event of a finding that plaintiff lacks the requisite standing to prove the pending claims. Accordingly, I find that the interests of justice and judicial economy favor a phased
approach to discovery, with the parties first addressing the threshold issue of plaintiff's standing, and later, if the suit goes forward, the merits of plaintiff's claims.

Accordingly, Magistrate Judge Peebles stayed discovery until February 1, 2007 or, in the event that defendant moved for summary judgment prior to that date, the resolution of the summary judgment motion. The stay did not apply to discovery directed to the issue of plaintiff's standing. On January 31, 2007, defendant made the instant motion for summary judgment.

## DISCUSSION

**Generally**

As discussed below, this Court grants summary judgment dismissing the action. The award of summary judgment is not based on any issue as to which the discovery sought by plaintiff in his motion to compel (Dkt. No. 60) could arguably be relevant. Thus, plaintiff cannot be prejudiced by this Court's ruling on summary judgment prior to this discovery. Nor is the award of summary judgment based on any issue as to which Barry's medical records could arguably have been relevant. Thus, it is not necessary to consider further whether and in what circumstances plaintiff may have been entitled to court-ordered disclosure of Barry's protected records under HIPAA.[2]

---

[2]
The Court does not read HIPAA as categorically precluding a court order disclosing a decedent's records to anyone except an estate representative in all circumstances. Nor does the Court read HIPAA as requiring court-ordered disclosure of a decedent's records to anyone who might choose to bring a lawsuit concerning a decedent's medical care. Rather, it is for the court to exercise its discretion to determine discoverability on a case-by-case basis, in light of the relevance of the

**Standard for summary judgment**

Summary judgment is appropriate "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006) (internal quotation marks omitted).  A dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities, and draw all inferences, against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

**Standing**

*Generally*

Plaintiff's amended complaint asserts a bystander claim for negligent infliction of emotional distress under New Jersey law.[3]  Defendant contends that, even accepting *arguendo* that New Jersey law applies, defendant is entitled to summary judgment because plaintiff lacks standing.  The Court agrees, for the reasons set forth below.

Under New Jersey law, a bystander claim for negligent infliction of emotional distress

records and all other pertinent factors.  *See generally* 65 FR 82462-01, *82675-76, discussing 45 CFR 164.512(e).

[3]

It is undisputed that New York law would not recognize plaintiff's claim; New York permits only spouses and immediate family members to pursue a bystander claim for negligent infliction of emotional distress.  *See generally Bovsun v. Sanperi*, 61 N.Y.2d 219, 230-31 (1984); *Jun Chi Guan v. Tuscan Dairy Farms*, 806 N.Y.S. 2d 713, 714-15 (2d Dep't 2005).

may be asserted where the following elements are present: a death or serious physical injury caused by the defendant's negligence; a marital or intimate familial relationship existing between the plaintiff and the victim of the negligence; the plaintiff's observation of the victim's death or injury; and plaintiff's resultant severe emotional distress.  *See Portee v. Jaffee,* 417A.2d 521, 528 (N.J.Sup.Ct. 1980) (recognizing bystander tort liability where a mother watched her seven-year-old son suffer and die when he became trapped in elevator).  New Jersey courts have allowed bystander liability claims in medical malpractice cases where the plaintiff was a marital or intimate family member of the injured patient, witnessed the malpractice, immediately connected or associated the malpractice with the injury, and suffered extreme emotional distress as a result. *See Gendek*, 654 A.2d at 974-75; *Frame*, 560 A.2d at 681.  And in *Dunphy*, New Jersey has expanded the term "intimate familial relationship" to allow a plaintiff to assert a bystander claim stemming from the accidental death of her fiancé with whom she cohabited.  642 A.2d at 380.

*Plaintiff's evidence*

In the case at bar, plaintiff claims that Barry died as a result of negligent medical care and that he has standing to pursue a bystander liability claim because he and Barry, although unmarried, shared an intimate familial relationship within the meaning of *Dunphy*.  The Court briefly summarizes plaintiff's evidence on this issue as set forth in his pleadings,[4] his affidavit, and his answers to defendant's interrogatories.  In 1979, the year they met, plaintiff and Barry resided at 1524 John Jay, Columbia University, New York, New York.  From 1980 to 1988 Barry

---

[4]

The proposed second amended complaint contains more factual detail than the amended complaint.  Particularly in view of plaintiff's *pro se* status, the Court considers the factual allegations in the proposed second amended complaint as well as all other record evidence.

lived at 14 Stone Street, North Plainfield, New Jersey, which appears to have been her parents'
home.  Plaintiff also indicates that between 1980 and 1983 Barry resided at 529 West 113th Street,
New York, New York, which was his address during those years.  In 1988 they both resided at
North Avenue Extension, Dunellen, New Jersey, and from 1989-1992, they both resided at 121
Prospect Street in Dunellen, New Jersey.

From 1992 until Barry's death on January 4, 2001, plaintiff resided in Smyrna, New York.
Throughout this time period, Barry resided at "Kenny's place" in East Millstone, New Jersey,
serving as a live-in caregiver for a handicapped person, in exchange for which she received room,
board, and money.[5]  According to plaintiff, he "commuted to see her from New York on a regular
basis[,]" and she went to Smyrna, New York to spend time with plaintiff "whenever she could get
away."  For example, in 1996 Barry came up to Smyrna to help plaintiff entertain his cousin and
others who were visiting for a week, and at some point Barry visited plaintiff in Arizona and they
"lived together" for nearly a month.  Plaintiff states that the period from 1992 until 2000 "was
very difficult for both of us after we had been living together permanently for 2+ years at 121
Prospect Street in Dunellen."  He adds: "But we both viewed it as temporary, and were both
looking forward to getting married, raising a family, and growing old together."

In November 2000, a few days prior to Barry's final illness, the two became engaged

---

[5]

In his affidavit, plaintiff states that Barry resided at Kenny's place from 1992 until her
hospitalization.  In his answers to defendant's interrogatories, he lists no residence for Barry from
1992 to 1994, and indicates that she began living at Kenny's place in 1994.  It is not necessary to
resolve this discrepancy, because in any event plaintiff does not claim that they lived together
during that time.

while plaintiff was visiting Barry in New Jersey.[6]  At that time, plaintiff says, Barry believed she was pregnant with plaintiff's child.  The following day, plaintiff left at around 11:30 a.m. to return home to Smyrna, New York because he was "running out of money and needed to get back to [his] bank in Chenango County[, New York] to get some."  A few days later, Barry "collapsed in a friend's office in East Millstone, New Jersey as the result of a grand mal epileptic attack or fainting spell," resulting in the hospitalization that ended in her death two months later.

Plaintiff also describes interaction over the years between his family and Barry's family. For example, Barry and her brother attended plaintiff's graduation from Columbia in 1981; Barry's parents and siblings once spent a week at a house owned by plaintiff's mother; plaintiff stayed at Barry's parents' home in New Jersey on many occasions; and he and Barry stayed at her sister's house and her brother's apartment in Manhattan on numerous occasions.

Plaintiff states that the pair never told other people they were married.[7]  He says he told a friend, Robert Hopkins, that he "felt like [he] was married to" Barry.[8]  Plaintiff submits an affidavit from Hopkins, who says he met Barry in 1979 when he, plaintiff, and others spent part of the winter at property she owned in Haiti.  Hopkins states: "As far as I know, [plaintiff and Barry] were very much in love.  In fact on more than one occasion, [plaintiff] explained to me

---

[6]

As plaintiff explains it, the engagement occurred when the two noticed a display of paste jewelry in a store in New Jersey and commented that the diamond rings looked real.  Barry slipped one of the rings on her finger, plaintiff asked her if she wanted to get engaged, she said yes, and "so [plaintiff] bought her a ring and [they] became engaged."

[7]

Plaintiff does state that, as he was leaving New Jersey after the two became engaged, Barry said, "Goodbye, husband!" and plaintiff responded, "Goodbye, wife!"

[8]

Plaintiff does not specify when he made this statement.  From Hopkins' affidavit, it appears that it may have been in the early to mid-1990's.

that he felt married to her."  They attended Hopkins' wedding on an unspecified date and remained for a week's visit, and attended Hopkins' sister's wedding in 1994.  He adds that the pair had "a very long-standing and durable relationship[.]"

Plaintiff also submits a letter from Daniel Kottke, who has known plaintiff for about 20 years.  He states that "during the period of the mid-late 90's" he heard plaintiff talk many times about his girlfriend; that he "believe[s] he recall[s] that [plaintiff] referred to her as his fiancé"; that he met them for dinner in 1997 and they were "clearly a happy couple"; and that he doesn't know whether they were living together.

*Analysis*

New Jersey law allows recovery "for the emotional injury suffered by a person, who, as a bystander, witnesses the wrongful death or serious physical injury of another person with whom the bystander had a close, substantial, and enduring relationship."  *Dunphy*, 642 A.2d at 373.  In *Dunphy*, New Jersey's high court held that a bystander claim may be maintained by "a person who was not legally married to a deceased victim but who cohabitated with and was engaged to marry the decedent."  *Id.*  In that case, the plaintiff and decedent (who died in September 1990), became engaged to marry in April 1988, began living together two months later, set a wedding date for February 1992, purchased life-insurance policies with each other as beneficiaries, maintained a joint checking account from which they paid their bills, and jointly purchased an automobile.  Decedent had asked plaintiff several times to elope with him, and had introduced her in public as his wife.  Based on this evidence, the court found that plaintiff had made a sufficient showing of an intimate familial relationship with the victim of the defendant's negligence to withstand summary judgment.  *See id.* at 380.

-9-

In allowing the *Dunphy* plaintiff's claim to go forward, New Jersey's high court declined to adopt a "bright-line" rule defining who could assert bystander standing. *Id.* at 376. Instead, that court opted for a "sedulous application of the principles of tort law[.]" *Id.* (internal quote omitted). In concluding that the plaintiff in that case represented an "eminently foreseeable but clearly discrete class of potential plaintiffs[,]" the *Dunphy* court found that "applying the standard of an intimate familial relationship to an unmarried cohabitant such as [the plaintiff] and affording her the protections of bystander liability is hardly unfair." *Id.* at 377.

Although New Jersey's high court does not explicitly state that cohabitation is a necessary element of *Dunphy*-type standing, a thorough review of New Jersey case law discloses no decision that extends *Dunphy* standing to a non-cohabiting plaintiff. *See, e.g., Lewis v. United States*, 2006 WL 902176, *4 (D.N.J.) (dismissing as a matter of law bystander claims by two friends of decedent, neither of whom had lived with decedent or had financial dealings with him); *see generally Larocco v. Gardella*, 799 A.2d 742, 746 (N.J.Super.Ch. 2002) (holding that the rule establishing venue in Chancery Division, Family Part, over all civil actions arising out of "a family or family-type relationship" covers non-married couples only where "a cohabitative domestic arrangement" exists between them); *V.C. v. M.J.B.*, 748 A.2d 539, 557 (N.J.Sup.Ct. 2000) (holding that same-sex former domestic partner of child's mother had standing to seek custody of and visitation with child; stating that generally an "intimate familial relationship" is "built on a commitment by the adults to live as a family, accompanied by the actuality of family life, involving the love, care, nurturance, protection, safety and education of the children in their care.").

Plaintiff alleges that he and Barry "cohabited" on many occasions. A careful reading of

-10-

plaintiff's submissions, however, establishes that he uses the word "cohabit" to refer to occasions when he and Barry stayed together at various places for short periods of time, such as the month spent in Arizona in 1996, or the week when they attended Hopkins' wedding.  As a matter of law, staying together at various places for brief periods of time while maintaining separate domiciles is not cohabitation.  *See generally Levine v. Konvitz*, 890 A.2d 354, 360 (N.J.Super. 2006) (stating, in "palimony" action, that "cohabitation requires the demonstrable act of setting up a household together"); *Larocco*, 799 A.2d at 746 ("[C]ohabitation... refers to a domestic arrangement between a man and woman who are not married to each other, but who live as husband and wife, in that, for more than a brief period of time, they share a common domicile and living expenses and are sexually intimate.") (citation and internal quotation marks omitted); *Konzelman v. Konzelman*, 704 A.2d 591, 595 (N.J.Super. 1998), *affd.* 729 A.2d 7 (N.J.Sup.Ct. 1999) ("[T]he term 'cohabitation' implies more than merely a common residence or a sexual relationship. We believe the ordinary definition of 'cohabitation,' describing a relationship of living together 'as man and wife,' connotes mutual assumption of the duties and obligations associated with marriage.") (citation omitted); Blacks Law Dictionary (8th ed. 2004) (defining "cohabitation" as "[t]he fact or state of living together, esp. as partners in life, usu. with the suggestion of sexual relations"); Merriam-Webster's Online Dictionary (defining "cohabit" as "to live together as or as if a married couple").

In the case at bar, plaintiff's evidence establishes that from 1992 until Barry's death in January 2001, the two never maintained a shared residence.  Throughout this time, plaintiff resided at 486 Hopkins-Crandall Road, Smyrna, New York.  From 1992 (or 1994) until her death, Barry resided at Kenny's place, in East Millstone, New Jersey.  Plaintiff avers that they resided

-11-

together in Dunellen, New Jersey, between 1988 or 1989 and 1992, prior to which they had separate residences for at least six years.  Thus, between 1983 and 2001, the parties lived separately for six years, then together for about three years, then separately for eight years until Barry's death.  Accepting all of plaintiff's factual evidence as true and drawing all reasonable inferences in his favor, the Court concludes that no reasonable jury could find on these facts that the parties were cohabitants as that term is used in *Dunphy*.

As noted, *Dunphy* does not explicitly require cohabitation as an essential element of an intimate familial relationship.  Thus, arguably, there may be circumstances in which the evidence concerning a relationship between an unrelated, unmarried non-cohabiting couple could support standing under *Dunphy*.  However, as a matter of law, the evidence adduced by plaintiff in the case at bar falls far short of demonstrating such circumstances.  The purport of *Dunphy* is that, in the context of *Portee*-type tort claims, some relationships which do not bear the "label" of marriage are entitled to the same recognition as marital relationships; surely this contemplates, at a minimum, more than strong emotional ties between two people who have maintained separate domiciles and separate lives for many years, as in the case at bar.[9]  In *Dunphy*, in addition to considering the couple's emotional ties, New Jersey's high court noted the couple's cohabitation for over two years, their payment of bills from a joint checking account, other evidence of financial integration, and the fact of their engagement and specific wedding plans.  642 A.2d at 373.  More generally, in listing relevant factors that "identify and define the intimacy and familial

---

[9] Indeed, in rejecting the argument that its holding subverts the state's interest in promoting marriage, the *Dunphy* court opines: "The State's interest in marriage would not be harmed if unmarried cohabitants are permitted to prove on a case-by-case basis that they enjoy a steadfast relationship that is <u>equivalent to a legal marriage</u> and thus equally deserves legal protection."  642 A.2d at 379 (emphasis added).

nature" of a relationship, the court referred not only to the emotional aspects of the couple's relationship, but also to "the extent of [their] common contributions to a life together," *id.* at 378, "the particulars of their day to day relationship," and "the manner in which they related to each other in attending to life's mundane requirements." *Id*. (citing the Appellate Division decision, 617 A.2d 1248, 1255 (N.J.Super. 1992)).

In the case at bar, the record evidence shows that plaintiff and Barry lived essentially separate lives legally, financially, and with respect to the incidents of everyday life.  There is no evidence of joint bank accounts, joint credit cards, or other joint formal financial arrangements.[10] Nor is there evidence of jointly owned real property, vehicles, or other assets.  While plaintiff indicates in conclusory terms that they assisted each other financially, "g[ave]/loan[ed] money back and forth," "pooled their money," and "budgeted their money together," he does not assert that the pair combined their income, paid their bills jointly, undertook mutual support obligations, took steps to ensure each other's future financial security (by taking out life insurance policies, for example), or regularly contributed financially towards a common goal.[11]  There is no showing of a systematic division of living expenses, nor of significant shared purchase and usage of household goods.  To the extent that they ate meals, cooked, and shopped for groceries together, these and similar activities would necessarily have occurred when one visited the other's residence or when they traveled together to some other place, not as part of a shared daily life

---

[10]

In fact, plaintiff states that the day after the couple became engaged in New Jersey, he had to return home to New York to go to the bank because he had run out of money.

[11]

In his proposed second amended complaint, plaintiff states that the two "engag[ed] in joint business enterprises," but gives no specific information.

together.

In addition, during the eight years between 1992 and Barry's death, not only did the two maintain separate domiciles, but they apparently did so without concrete plans to cohabit in the near future.  Although plaintiff states that the period from 1992 until 2000 was "very difficult" for them, and that "both viewed it as temporary," plaintiff makes no mention of any compelling circumstances that forced them to live separately for such a long period of time, nor do the two appear to have taken any practical steps to alter the situation prior to their seemingly impulsive engagement.  The day after they became engaged, they returned to their separate residences and lives.  They do not appear to have announced their engagement, set even a tentative date to wed, or otherwise made any specific plans to integrate their daily lives.

The Court rejects plaintiff's argument that "[t]he time that [they] were away from each other during any certain time period might be compared to the time that a union lineman spends away from his family while on the job in another state; or to the time that a married serviceman spends away from his family overseas on duty."  Such situations – in which a spouse is required by work or military duty to be absent from the marital domicile even for an extended period of time but does not establish a new, separate domicile – differ significantly from the instant situation, not only because plaintiff and Barry had maintained separate domiciles for the last eight years, but because they did not enter into any of the financial and other obligations incident to marriage.  Nor does the high divorce rate cited by plaintiff change the fact that by the act of marrying, a couple automatically undertakes mutual legal and financial obligations far exceeding those alleged by plaintiff or cited in *Dunphy* as evidence of an intimate familial relationship.

Viewed in the light most favorable to plaintiff, his evidence that he and Barry enjoyed a

-14-

long-term relationship, provided mutual emotional support, visited each other frequently, had

sexual relations during those visits, assisted each other financially, shared numerous activities,

and planned to marry at some indefinite point in the future, fails as a matter of law to establish the

intimate familial relationship contemplated by *Dunphy*.  This Court has reviewed New Jersey case

law and finds no indication that New Jersey courts would extend *Dunphy* standing to allow

plaintiff here to proceed with his claim.  Accordingly, defendant's motion for summary judgment

dismissing the action is granted and plaintiff's cross motion for leave to serve a second amended

complaint is denied.

**Emotional distress**

> ### *Generally*

Defendant argues that, even if plaintiff were able to raise a question of fact on standing

under *Dunphy*, summary judgment is warranted because he fails to establish another essential

element of his claim for negligent infliction of emotional distress under New Jersey law, *i.e.*, he

fails to show that he contemporaneously observed the alleged acts of negligence and their fatal or

gravely-injurious effects on Barry.  The Court agrees.

In cases of accidental injury or death, New Jersey law allows bystander recovery for

negligent infliction of emotional distress upon proof of the following elements: "(1) the death or

serious physical injury of another caused by defendant's negligence; (2) a marital or intimate

familial relationship between plaintiff and the injured person; (3) observation of the death or

injury at the scene of the accident; and (4) resulting severe emotional distress."  *Portee*, 417 A.2d

at 528 (reversing dismissal of claim for negligent infliction of emotional distress by mother who

watched her seven-year-old son suffer and die when he became trapped in elevator).  The *Portee*

-15-

court limited recovery to "negligent conduct which strikes at the plaintiff's basic emotional security."  417 A.2d at 527.  Thus, to recover, "the plaintiff should observe the kind of result that is associated with the aftermath of an accident, such as bleeding, traumatic injury, and cries of pain."  *Frame*, 560 A.2d at 678 (citation omitted).

New Jersey's high court extended *Portee*-type liability to cases involving medical malpractice where the plaintiff "witnesse[d] the ... malpractice, observe[d] the effect of the malpractice on the patient, and immediately connect[ed] the malpractice with the injury[.]"  *Frame*, 560 A.2d at 681.  Such a claim requires "the simultaneous concurrence or rapid sequence of events associated with a shocking event."  *Id.* at 678-79.  As the *Frame* court explained, "a misdiagnosis normally does not create the kind of horrifying scene that is a prerequisite for recovery.  Rarely will a member of the patient's family contemporaneously observe the immediate consequences of the defendant's misdiagnosis, and even more rarely will the results of the misdiagnosis be the injury or death of a loved one contemplated by the gruesome scene portrayed in *Portee*."  *Id.* at 680; *accord Carey v. Lovett*, 622 A.2d 1279, 1288 (N.J.Sup.Ct. 1993) (stating that plaintiff "must contemporaneously observe the malpractice and its effects on the victim" and that the injury must be "shocking in the sense the [plaintiff] did not have time to prepare for the injury"); *Lindenmuth v. Alperin*, 484 A.2d 1316, 1318 (N.J.Super. 1984) (requiring "sensory perception of a shocking event").

   *Evidence and analysis*

Plaintiff does not claim to have been present at Barry's death, which he says resulted from nosocomial infections (*i.e.*, infections acquired in the hospital) in her urinary tract and stomach lining.  Thus, he cannot proceed on the ground that he observed an act of negligence or

-16-

malpractice and its contemporaneous fatal effect on Barry.  *See, e.g., Frame*, 560 A.2d at 681 (rejecting bystander liability claim by parents for death of infant hours after physician misdiagnosed injury); *Lindenmuth*, 484 A.2d at 1318-19 (denying recovery for parents' emotional distress from death of child three days after failure to diagnose).

     Plaintiff's proposed second amended complaint avers that on four occasions during Barry's hospitalization he contemporaneously observed acts of medical negligence and the resultant injury to Barry.  In one incident, at an unspecified point during Barry's two-month-long hospitalization, plaintiff alleges that Barry was "sedately resting and recuperating in a mild coma"; that two or three technicians entered her room and disconnected her respirator; that plaintiff believed this was "the last thing in the world" that should have been done; that Barry reacted violently, "kicking her legs and twisting back and forth"; and that she was "soon exhausted by her efforts and collapsed back onto the bed."  Plaintiff does not claim he contemporaneously observed any further effect of the allegedly improper care.  The allegation that Barry, who was comatose, struggled briefly in response to a medical procedure and then collapsed back on her bed, with no further contemporaneously observable consequence, does not describe the type of sudden, severe injury that is a prerequisite for recovery under *Portee* and *Frame*.  Nor does plaintiff's personal belief that Barry "had suffered an irreversible injury as a result of this long-term interruption in her oxygen supply," even if true, support a finding that plaintiff contemporaneously observed the kind of shocking event contemplated by those cases.

     In another instance, plaintiff alleges that he observed fluids clogging Barry's breathing tube and had to go find someone to remove the fluids.  He says he "immediately connected [the nurses'] blasé attitude and inattentiveness with injury to Mary Catherine, who should have been

-17-

under constant surveillance."  He adds that he was aware at the time that nosocomial pneumonia is a common result of improper ventilator care.  There is, however, no allegation that he contemporaneously observed the type of consequential injurious effect on Barry that would satisfy *Frame*.  Similarly, he avers that once, during the first week of Barry's hospitalization, the setting on her respirator was set too high.  According to plaintiff, he could see that she "was hopelessly struggling to keep up at that high rate of speed, and that it was fatally exhausting her weakened system autonomic breathing system."  He says he was distressed that none of the staff could see that "the fast setting was overtaxing her to death, and needed to be adjusted downward to the normal adult resting rate[.]"  The incident lacks the element of a contemporaneous observation of an immediate consequential injurious effect on Barry as required by *Frame*.  This element is also lacking from plaintiff's assertion that he saw Barry "hooked up" to a urinary catheter, which he says "is almost sure to result in a serious, and sometimes fatal urinary tract infection."

The Court concludes that, viewed in the light most favorable to plaintiff, plaintiff's factual allegations in the case at bar would not permit a reasonable jury to find that plaintiff is entitled to recover under *Frame*.  Accordingly, defendant's motion for summary judgment is granted and plaintiff's cross motion to file and serve a second amended complaint is denied on the ground of futility.

## CONCLUSION

Defendant's motion for summary judgment is granted and the action is dismissed with prejudice.  Plaintiff's cross motion for leave to file and serve the proposed second amended complaint is denied.  In view of these rulings, the Court does not address the other issues raised in

-18-

the motions.

It is therefore

ORDERED that defendant's motion (Dkt. No. 68)  for summary judgment dismissing the
action is granted; and it is further

ORDERED that plaintiff's cross motion (Dkt. No. 69) for leave to file and serve a second
amended complaint is denied.

IT IS SO ORDERED.

July 3, 2007
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

-19-